UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| RAYMOND TODD LININGER, | Case No. 3:08CV3006 |
| Petitioner, | JUDGE JAMES S. GWIN |
| v. | Magistrate Judge George J. Limbert |
| ROBERT WELCH, Warden, | |
| Respondent. | **Report and Recommendation of Magistrate Judge** |

Petitioner Raymond Lininger ("Petitioner") has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. ECF Dkt. #1. Petitioner seeks relief for alleged constitutional violations that occurred during his Lucas County, Ohio Court of Common Pleas conviction for two counts of kidnapping, two counts of robbery, and one count of felonious assault. ECF Dkt. #1. On May 26, 2009, Respondent Robert Welch ("Respondent") filed an answer. ECF Dkt. #6. On July 7, 2009, Petitioner filed a traverse. ECF Dkt. #9.

The case was referred to the undersigned for a Report and Recommendation. For the following reasons, the undersigned RECOMMENDS that the Court DISMISS the petition in its entirety with prejudice:

**I. SYNOPSIS OF THE FACTS**

The Sixth District Court of Appeals of Ohio set forth the facts of this case on direct appeal. These binding factual findings "shall be presumed to be correct," and Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. §2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998), *cert. denied*, 119 S.Ct. 2403 (1999). As set forth by the Sixth District Court of Appeals, the facts are:

{¶ 3} Gail Kaminski testified that shortly after 11:00 p.m. on May 22, 2004, she drove to Delaney's, a bar off of Alexis Road in Toledo, Ohio. While in the parking lot of Delaney's, Kaminski was approached by a man, she later identified as Lininger, who asked for directions to "L'il Sheba's." She testified that after giving Lininger directions, she entered Delaney's but then returned to her car to get her ID. While opening her car door, Kaminski was confronted by Lininger, who put a gun in her back and said "Get in the car now, bitch, or I'll blow your head off." Kaminski testified that she was forced to slide from the driver's side of the car to the passenger side. Then, while driving Kaminski's car, Lininger asked her to give him all the money she had.

{¶ 4} Kaminski testified that while she was in the car with Lininger, he drove with one hand and used his other hand to hold his gun against her hip. When she told Lininger she only had $15, he drove her to an ATM and backed up to the ATM, so that Kaminski could access it from the passenger side. Kaminski further testified that Lininger said "You do anything funny, anything, I swear to God to you, I'll blow a hole in your back and then I'll kill myself, because I ain't going to jail."

{¶ 5} After showing Lininger that she did not have any money in the bank, Kaminski offered to give him her checkbook. Kaminski testified that Lininger then drove her to a party store on Alexis Road to have her write a check. Lininger followed her into the party store after again threatening to "blow a hole" in her and to kill himself if she did anything or said anything wrong. While in the party store Lininger stood directly behind Kaminski. Kaminski testified that the party store would not cash her check, so they returned to her car.

{¶ 6} Kaminski testified that Lininger then drove her to a Kroger's store on Laskey Road. She stated that Lininger accompanied her into the Kroger's after again threatening to shoot her and himself if she did anything wrong. Kaminski purchased cigarettes and batteries for Lininger and then asked if she could write a check for an amount over the purchase. Kroger's, however, would not allow her to write a check over the purchase amount because it was after 11:00 p.m.

{¶ 7} Kaminski testified that after returning to her car, Lininger drove to Rico's, a bar on Alexis Road. Kaminski stated that before entering Rico's, Lininger once again threatened to shoot her and himself if she did anything wrong. While in the bar, Lininger ordered two drinks, but when the waitress would not accept a check from Kaminski, Lininger grabbed Kaminski by the arm and left the bar.

{¶ 8} Katherine Dyer, a waitress at Rico's, testified that a couple came in to the bar on May 22, 2004, and asked to cash a check after ordering two drinks. Dyer was unable to describe the female in the couple, but she described the male in the couple as being white, with a medium build, scruffy, and with long hair.

{¶ 9} Kaminski testified that after leaving the bar, she told Lininger that she had a friend at Raceway Park on Telegraph and Alexis Roads. Lininger then drove them to Raceway Park and again threatened Kaminski before entering the track. Kaminski testified that before entering Raceway Park, Lininger promised to let her go if she got him $50. Once inside, Lininger stood a bit farther away from Kaminski while Kaminski approached her friend, Paola Pino, who was working at the time. Kaminski testified that she told Pino "give me fifty dollars now. See that guy back there? If you do not give me fifty dollars I'm going to die." Pino gave Kaminski the $50 and Kaminski and Lininger left.

{¶ 10} Paolo Pino testified that Kaminski had come into Raceway park on the evening of May 22, 2004, and said "Give me fifty dollars right now or I am about to die." Pino testified that there was a man there with Kaminski, who she described as a white man, scruffy, with long hair.

{¶ 11} Kaminski testified that after leaving Raceway Park she convinced Lininger that she did not tell on him or say anything while getting the $50. Kaminski stated that Lininger drove her to a neighborhood by Delaney's, stopped in the street, and told her to get out of the car. Kaminski then testified that Lininger got out of the car and told her to walk away and not to look back. Once Lininger was gone, Kaminski got back into her car, drove back to Raceway Park, and called the police.

{¶ 12} After the incident, Kaminski described Lininger to the police as a "Skinny guy, bad teeth, really bad teeth, pony tail, sweat shirt, jeans." Kaminski testified that about a week later she met with Detective Permar and picked Lininger out of a photo lineup. Kaminski also identified Lininger in court.

{¶ 13} The facts regarding the May 30, 2004 incident were testified to as follows:

{¶ 14} On the evening of May 30, 2004, Cassandra Wheeler was at the Kroger's grocery store on Lewis and Alexis Roads purchasing cake and ice cream. Wheeler testified that after loading the groceries into her silver Nissan Sentra she was about to leave the parking lot when a man who she subsequently identified as Lininger tapped on her driver's side window. Wheeler stated that Lininger pointed to her front driver side wheel and said "You have a flat tire." Wheeler testified that she exited her car to investigate, but after seeing that her tire was not flat she noticed that Lininger had a gun out and pointed at her. Wheeler stated that Lininger said something to the effect of "yeah, I have a gun, get in the car." Wheeler testified that she only saw the front part of the barrel, but Lininger did something to the gun to make it click.

{¶ 15} Wheeler testified that she entered her car through the driver's side door and climbed over the center console to the front passenger's side seat. Wheeler testified that Lininger said something to the effect of "Yes, I've got a gun." Lininger then drove Wheeler to a Fifth/Third Bank on the corner of Lewis and Alexis Roads, where he backed up to the ATM. Wheeler testified that Lininger drove with one hand and held a gun pointed at her side with the other. Wheeler stated that Lininger instructed her to use the ATM to pull out as much money as she could. After many tries, however, Wheeler could not get the ATM machine to accept her card. Wheeler stated that as she kept trying to use the ATM unsuccessfully, Lininger grew more frustrated.

{¶ 16} Wheeler testified that Lininger left the bank and drove west on Alexis towards Secor Road. Wheeler stated that she attempted to reach her cell phone in the back seat to call an emergency number, but Lininger noticed what she was doing and took her cell phone away. Wheeler stated that she then tried to talk Lininger into letting her call her father to get him some money, but Lininger refused. Wheeler testified that she felt a need to "get away any way" she could.

{¶ 17} Lininger then turned into a neighborhood and headed north. Wheeler stated that she then noticed that Lininger did not have his gun in his hand any longer. Rather, he was holding the wheel and gearshift. Wheeler testified that as the car approached an intersection, she decided to jump out the passenger door. Wheeler stated that as she jumped from the car, Lininger accelerated and somehow she was dragged by the car along the street curb. Wheeler testified that she was eventually free of the car, but only after the car ran over her legs.

{¶ 18} Michael Henry testified that on May 30, 2004, while driving north on Secor Road, he saw Wheeler's car jump forward, go up over the curb, and then drive away. When Henry turned onto Glenn Road, the street that he saw the car speed off from, he saw Wheeler laying in the road screaming. Henry stated that the events he saw occurred around 9:00 or 9:10 p.m. Henry testified that when he approached Wheeler, she was screaming and said "He's got a gun. He stole my car." Henry also stated that he noticed a tire track on Wheeler's ankle all the way up to her hip. Henry stated that all he remembered was the Nissan, Wheeler's car, take off north on Secor Road, though he could not identify the driver of the car.

{¶ 19} Irma Oberneder, a police officer called to the scene of where Wheeler jumped from the car, testified that she interviewed Wheeler after the incident. Oberneder's testimony corroborates Wheeler's testimony as to the events that took place on May 30, 2004. Oberneder testified that Wheeler described the assailant as a white male, 47 to 52 years old, with brown curly collar length hair, messed up teeth, between five feet eight inches and five feet ten inches tall, and weighing between 140 to 150 lbs. Oberneder also testified that Wheeler stated that, aside from her Nissan, she was missing her cellular phone, a Capital One credit card, and a key chain.

{¶ 20} After the incident, Wheeler described the assailant to the police as having a pony tail, wearing a hat and a windbreaker, and having "messed up teeth." Wheeler testified that after the incident she met with Detective Tetuan and was asked to identify Lininger from a photo lineup. Wheeler was able to narrow her identification of the assailant down to two photographs, one of which was Lininger. Wheeler admitted that it was not until after she saw Lininger on television that she was positive that she could identify him. Wheeler identified Lininger in court during the trial as the man who abducted her.

{¶ 21} After Wheeler identified Lininger in court, the prosecution had Lininger display his teeth to the jury over Lininger's objection. The court allowed this, as it addressed an identification question in witness testimony.

{¶ 22} Paul Tetuan, a detective working for the special victims unit of the Toledo Police Department, testified that he interviewed Wheeler at the site where Wheeler jumped from her car and at a later date. Tetuan stated that at the accident site Wheeler described Lininger as having messy teeth. Wheeler also described Lininger's height, weight, clothing, and hair.

{¶ 23} Tetuan testified that through a lead generated by the Crime Stopper program, he developed a possible suspect in Wheeler's case. Tetuan stated that he met with Wheeler two days after the incident and showed her a photo array. Tetuan testified that Wheeler was able to narrow the photo array down to two persons, but Wheeler was unable to select which of the two persons was her assailant. Under cross-examination Tetuan stated that out of the two person in the photo array, Wheeler indicated that she thought that it was more likely that the other person, not Lininger, was her assailant.

{¶ 24} Jeffrey Dorner, a police officer in the Toledo Police Department, testified that on June 2, 2004, he responded to a report of a suspicious automobile on the 200 block of Linden. Upon investigation, Dorner discovered that the Nissan was reported stolen and that detectives told him it had been used in a kidnapping. He further stated that the stolen Nissan belonged to Wheeler. Tetuan testified that no finger prints were found in Wheeler's car.

{¶ 25} William Seymour, a detective for the Toledo Police Department, testified that on June 3, 2004, he aided Detective Permar in executing a search warrant of Lininger's

>apartment at 740 West Alexis Road in Toledo, Ohio. Seymour stated that Lininger was present at the apartment as it was being searched. Seymour stated that he and other officers were searching for "any weapon, such as a gun, or any, perhaps, property belonging to any of the two females, the victims in this cases." Seymour testified that neither a gun nor any property belonging to Wheeler or Kaminski was recovered from Lininger's apartment.
>
>{¶ 26} Seymour testified that he interviewed Lininger at the police station after the search of his residence. During that interview, Lininger indicated that he was familiar with the places where the kidnappings initially occurred, and that four or five days earlier, he had been in the Kroger's parking lot, where Wheeler was kidnapped, to collect cigarette butts. Seymour testified that Lininger denied any involvement in the offenses for which he was arrested.

ECF Dkt. #6, Ex. 9; *State v. Lininger*, Case No. L-05-1199, 2006 WL 2322813 at ¶¶ 3-26 (Ohio App. 6 Dist. Aug. 11, 2006), unreported.

## II. PROCEDURAL HISTORY

### A. State Trial Court Conviction

On June 11, 2004, the Lucas County, Ohio prosecuting attorney filed an indictment charging Petitioner with: (Counts One and Two) Aggravated Robbery in violation of Ohio Revised Code ("O.R.C.") §2911.01(A)(1), with firearm specifications pursuant to O.R.C. §2941.145; (Counts Three and Four) Kidnapping, in violation of O.R.C. §2905.01(A)(2),with firearm specifications pursuant to O.R.C. §2941.145;(Counts Five and Six) Robbery in violation of O.R.C. § 2913.02; and (Count Seven) Felonious Assault in violation of O.R.C. § 2903.11(A)(2) . ECF Dkt. #6, Ex. 1.

The case proceeded to a jury trial. ECF Dkt. #6, Ex. 3. The State moved to dismiss Count Two – Aggravated Robbery and Count Five – Robbery. *See* ECF Dkt. #6 at 6. Apparently, the Counts were renumbered following dismissal of these charges, but the undersigned cannot be sure because the pertinent portion of the trial transcript has not been provided. *Compare* ECF Dkt. #6, Ex. 1 *with* ECF Dkt. #6. Ex. 5,6. The jury ultimately considered six charges and found Petitioner guilty of five: Counts One – Aggravated Robbery occurring on May 22, 2004; Count Three – Kidnapping occurring on May 22, 2004; Count Four – Aggravated Robbery occurring on May 30, 2004; Count Six – Kidnapping occurring on May 30, 2004; and Count Seven (Lesser Included Offense) – Negligent Assault occurring on May 30, 2004. ECF Dkt. #6, Ex. 3-6, 8. The jury found Petitioner not guilty of Count Seven – Felonious assault occurring on May 30, 2004. ECF Dkt. #6, Ex. 7. Hereinafter, the undersigned will refer to the Counts based upon their designations on the

verdict forms, not as they were enumerated in the indictment.

On June 13, 2005, the trial judge sentenced Petitioner to serve a term of four years in prison for Count One, six years in prison for Count Three, four years in prison for Count Four, six years in prison for Count Six, and sixty days in prison for Count Seven. ECF Dkt. #6, Ex. 9. The trial judge imposed an additional three year terms of imprisonment for the firearms specifications in both Counts One and Six. *Id*. The Court ordered all sentences to be served consecutively, except for Count Seven, which was to run concurrently. *Id*. The trial court calculated Petitioner's aggregate sentence to be 26 years. *Id*.

### B.     Direct Appeal

On June 16, 2005, Petitioner filed a notice of appeal from the Lucas County Court of Common Pleas conviction. ECF Dkt. #6, Ex. 10. On December 16, 2005, Petitioner filed a brief in support of his direct appeal, raising the following assignments of error:

> I.     Lininger's convictions were not supported by the limited available evidence and, in fact, were against the manifest weight of the evidence.
>
> II.    The trial court erred in refusing to allow separate trials of these multiple counts involving two victims and two incidents.
>
> III.   The victim's pretrial identification of Lininger was so suggestive that her in court identification was impermissibly tainted.
>
> IV.    The state's closing arguments were improper and constituted misconduct.
>
> V.     The manner in which Lininger was forced to display his teeth to the jury was unconstitutional.
>
> VI.    The trial court violated Liniger's constitutional rights through the sentence that was imposed.

ECF Dkt. #6, Ex. 11. On January 24, 2006, the state filed a brief on the merits. ECF Dkt. #6, Ex. 12. On August 11, 2006, the Sixth District Court of Appeals affirmed the trial court's judgment in part and reversed it in part. ECF Dkt. #6, Ex. 13. The appellate court vacated the trial court's sentence and remanded the case for resentencing pursuant to *State v. Foster*, 845 N.E.2d 470 (Ohio 2006). ECF Dkt. #6, Ex. 13.

### C.     Resentencing

On September 12, 2006, the trial court resentenced Petitioner and imposed the same

aggregate 26 year sentence as before. ECF Dkt. #6, Ex. 14.

On October 11, 2006, Petitioner filed a notice of appeal to the Sixth District Court of Appeals. ECF Dkt. #6, Ex. 15. On appeal, Petitioner raised the following assignment of error:

> I. The sentencing court improperly made findings of fact in imposing sentences that were not the shortest authorized, and by imposing consecutive sentences.

ECF Dkt. #6, Ex. 16. On July 20, 2007, the appellate court affirmed the trial court's judgment. ECF Dkt. #6, Ex. 17.

On August 23, 2007, Petitioner filed a notice of appeal to the Supreme Court of Ohio. ECF Dkt. #6, Ex. 18. Petitioner filed a memorandum in support of jurisdiction raising the following proposition of law:

> I. The sentencing court improperly made findings of fact in imposing sentences pursuant to R.C. 2929.14 that were not the shortest authorized, and by imposing consecutive sentences.

ECF Dkt. #6, Ex. 19. On August 31, 2007, appellate counsel filed an additional memorandum in support of jurisdiction, raising the following proposition of law:

> I. The remedy that this Court set forth his State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856 violates the Ex Post Facto and Due Process Clauses of the United States Constitution.

ECF Dkt. #6, Ex. 20. On October 1, 2007, the state filed a memorandum opposing jurisdiction. ECF Dkt. #6, Ex. 21. On June 11, 2008, the Supreme Court of Ohio declined jurisdiction on the basis that the case did not involve a substantial constitutional question. ECF Dkt. #6, Ex. 22.

### D.  28 U.S.C. § 2254 Petition

On December 24, 2008, Petitioner filed the instant petition for a writ of habeas corpus. ECF Dkt. #1. Petitioner raised the following ground for relief:

> **GROUND ONE:** Petitioner's constitutional right to due process of law and the protection against the imposition of ex post facto law, as guaranteed by the Due Process and Ex Post Facto Clauses of the United States Constitution, were violated when the trial court imposed consecutive sentences that were greater than the minimum.

ECF Dkt. #1. On May 26, 2009, Respondent filed a return of writ. ECF Dkt. #6. On July 7, 2009, Petitioner filed a traverse. ECF Dkt. #8. On September 22, 2009, Petitioner sent a letter to the Court

regarding his status as an inmate. ECF Dkt. #9.

## III. PROCEDURAL BARRIERS TO REVIEW

A petitioner must overcome several procedural barriers before a court will review the merits of a petition for a federal writ of habeas corpus. As Justice O'Connor noted in *Daniels v. United States*, "Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim." 532 U.S. 374, 381 (2001); *see also United States v. Olano*, 507 U.S. 725, 731 (1993).

Further, the Supreme Court has held that it would be in the interests of the parties and the courts for the merits of a petition to be addressed forthwith if it is clear that the applicant does not even raise a colorable federal claim. *Granberry v. Greer*, 481 U.S. 129, 135 (1987); *Prather v. Rees*, 822 F.2d 1418, 1421-22 (6th Cir. 1987) (lack of exhaustion was properly excused where petition was plainly meritless, the state had not addressed exhaustion, and disposition of the case would not offend federal-state comity).

Respondent does not assert that any procedural bars apply to Ground One. *See* ECF Dkt. #6. Therefore, it is unnecessary to discuss the law pertaining to procedural bars in further detail.

## IV. STANDARD OF REVIEW

If Petitioner's claims overcome the procedural barriers of time limitation, exhaustion and procedural default, AEDPA governs this Court's review of the instant case because Petitioner filed his petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 on February 26, 2007, well after the act's effective date of April 26, 1996. *Harpster v. Ohio*, 128 F.3d 322, 326 (6th Cir. 1997), *cert. denied*, 522 U.S. 1112 (1998). Under Section 2254, a state prisoner is entitled to relief if he is held in custody in violation of the United States Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(d).

The AEDPA sets forth the standard of review for the merits of a petition for the writ of habeas corpus. The AEDPA provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

>   (1)  resulted in a decision that was *contrary to*, or involved an *unreasonable application of*, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>   (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added). In *Williams v. Taylor*, the Supreme Court clarified the language of 28 U.S.C. § 2254(d) and stated:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Furthermore, the Supreme Court declared that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* Elaborating on the term "objectively unreasonable," the Court stated that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.*; *see also Bailey v. Mitchell,* 271 F.3d 652, 655-56 (6th Cir. 2001).

The Sixth Circuit Court of Appeals offers the following guidelines for applying the AEDPA limitations:

>   A.  Decisions of lower federal courts may not be considered.
>
>   B.  Only the holdings of the Supreme Court, rather than its dicta, may be considered.
>
>   C.  The state court decision may be overturned only if:
>
>       1.  It '[applies] a rule that contradicts the governing law set forth in [Supreme Court of the United States] cases,' [the Supreme Court precedent must exist at the time of petitioner's direct appeal] or;

      2.      the state-court decision 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent;' or

      3.      'the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case;' or

      4.      the state court 'either unreasonably extends a legal principle from [a Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'

    D.    Throughout this analysis the federal court may not merely apply its own views of what the law should be. Rather, to be overturned, a state court's application of Supreme Court of the United States precedent must also be objectively unreasonable. That is to say, that 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.' 'An unreasonable application of federal law is different from an incorrect or erroneous application of federal law.'

    E.    Findings of fact of the state courts are presumed to be correct. 'The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.'

*Bailey v. Mitchell,* 271 F.3d 652, 655-56 (6th Cir. 2001) (internal citations omitted).

Finally, a reviewing federal court is bound by the presumption of correctness, under which the federal court is obligated to "accept a state court's interpretation of the state's statutes and rules of practice." *Hutchinson v. Marshall*, 744 F.2d 44, 46 (6th Cir. 1984), *cert. denied*, 469 U.S. 1221 (1985); *see also Duffel v. Dutton*, 785 F.2d 131, 133 (6th Cir. 1986). The presumption of correctness is set forth in 28 U.S.C. § 2254(e), which provides:

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.

28 U.S.C. § 2254(e). The presumption of correctness applies to basic primary facts, and not to mixed questions of law and fact. *Levine v. Torvik*, 986 F.2d 1506, 1514 (6th Cir. 1993), *cert. denied,* 509

U.S. 907 (1993). The presumption also applies to "implicit findings of fact, logically deduced because of the trial court's ability to adjudge the witnesses' demeanor and credibility." *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996), *cert. denied*, 520 U.S. 1257 (1997). Furthermore, a reviewing federal court is not free to ignore the pronouncement of a state appellate court on matters of law. *See Central States, Southeast & Southwest Areas Pension Fund v. Howell*, 227 F.3d 672, 676, n.4 (6th Cir. 2000). Petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

**V.    ANALYSIS**

Petitioner alleges that the trial court erred by imposing non-minimum consecutive prison terms. ECF Dkt. #1. He further alleges that the court's application of the remedy articulated by the Ohio Supreme Court in *Foster* to Petitioner's case contravenes the Ex Post Facto Clause and Due Process Clauses of the federal constitution. *Id*. Lastly, he contends that the retroactive application of *Foster* was unexpected and indefensible and that *Foster* court's remedy was not analogous to the U.S. Supreme Court's remedy in *Booker*. ECF Dkt. #8. All of these arguments have been repeatedly rejected by district courts in this Circuit. *See Orwick v. Jackson*, Case No. 3:09CV0232, 2009 WL 4043352 (N.D.Ohio Nov. 20, 2009), unreported; *Ross v. Kelley*, No. 5:08CV2889, ___ F.Supp.2d ___, 2009 WL 3208668 (N.D. Ohio Oct. 5, 2009), slip op.; *Kravochuck v. Shewalter*, No. 1:09CV199, 2009 WL 3208663 (N.D. Ohio Oct. 5, 2009), unreported; *Woody v. Welch*, No. 3:08CV2534, 2009 WL 1440828 at *10 (N.D. Ohio, May 20, 2009), unreported; *McGhee v. Konteh*, No. 1:07CV1408, 2008 WL 320763 (N.D.Ohio Jan. 25 2008), unreported; *see also Cooper v. Hudson*, Case No. 3:07 CV 610, 2008 WL 2001282, n. 8 (N.D.Ohio May 5, 2008) (in a situation where a Petitioner had not been re-sentenced under *Foster*, the Northern District of Ohio granted habeas relief and explicitly acknowledged that the Petitioner would be resentenced under post-*Foster* sentencing statutes. The court noted that the trial court had discretion to impose a range of sentences on remand under the post-*Foster* sentencing scheme.). Therefore, the undersigned recommends dismissing the instant petition in its entirety with prejudice, for the reasons discussed below.

### A. Pertinent Law

Prior to Petitioner's initial sentencing, the U.S. Supreme Court decided *Apprendi* and held that, other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490. Also prior to Petitioner's initial sentencing, the U.S. Supreme Court decided *Blakely* and held that the statutory maximum for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant, and not the maximum sentence a judge may impose after finding additional facts. *Blakely*, 542 U.S. at 303.

At the time Petitioner was convicted, the Ohio Revised Code allowed for a sentence of three to ten years for felonies of the first degree (Counts One, Three, Four, and Six in this case). O.R.C. §§ 2929.14(A)(1). However, the Revised Code further provided that:

> (B) Except as provided in division (C), (D)(1), (D)(2), (D)(3), or (G) of this section, in section 2907.02 of the Revised Code, or in Chapter 2925. of the Revised Code, if the court imposing a sentence upon an offender for a felony elects or is required to impose a prison term on the offender, the court shall impose the shortest prison term authorized for the offense pursuant to division (A) of this section, unless one or more of the following applies:
>
> > (1) The offender was serving a prison term at the time of the offense, or the offender previously had served a prison term.
> >
> > (2) The court finds on the record that the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others.

O.R.C. § 2929.14(B) (West 2004). On February 27, 2006, the Supreme Court of Ohio consolidated four criminal cases in an opinion styled *State v. Foster* and held, *inter alia*, that R.C. § 2929.14(B) was unconstitutional because it "require[d] judicial fact-finding before imposition of a sentence greater than the maximum term authorized by a jury verdict or admission of the defendant." *Foster*, 845 N.E.2d at 495. The Supreme Court of Ohio went on to remedy the error by severing the

-12-

unconstitutional mandatory judicial factfinding provisions:

> [R]eferences to mandatory judicial fact-finding properly may be eliminated in the four areas of concern. Without the mandatory judicial fact-finding, there is nothing to suggest a "presumptive term." To explain Ohio's "statutory maximum" for purposes of Apprendi and its progeny, the maximum prison term authorized by the jury verdict or the facts admitted by a defendant upon acceptance of a plea is the top of the sentencing range for the crime of which the defendant is convicted. For example, if the offender is convicted of a first-degree felony, the "statutory maximum" is ten years under R.C. 2929.14(A)(1).

*Id.* at 497.

### B. Application of law to Petitioner's case

The undersigned recommends that the Court reject Petitioner's arguments. Insofar as Petitioner contends that he is entitled to relief because the trial court was improperly required to make factual findings before imposing a sentence, his claim lacks merit because he was resentenced under a sentencing statute that did not mandate judicial factfinding. He has already received relief vitiating the initial constitutional violation pertaining to his right to a trial by jury. *See Cooper*, 2008 WL 2001282 at *9, n. 8. The next issue is whether the Ohio courts violated Petitioner's other constitutional rights as protected by the Due Process Clause when the courts severed unconstitutional portions of the statute in *Foster* and applied that statute on remand in Petitioner's case.

Petitioner contends violations of both the Ex Post Facto Clause and the Due Process Clause of the federal constitution resulting from the retroactive application of post-*Foster* sentencing statutes to his case on remand. *See* ECF Dkt. #1, Attach. C. To the extent Petitioner's claim implicates the Ex Post Facto Clause, it lacks merit because the Supreme Court of Ohio is not a legislature bound by the Ex Post Facto Clause. The Ex Post Facto Clause is contained in Article I of the federal constitution, which pertains to legislative powers. And the United States Supreme Court made clear in *Rogers v. Tennessee*, 532 U.S. 451, 456 (2001), "As the text of the [Ex Post Facto] Clause makes clear, it is a limitation upon the powers of the Legislature, and does not of its own force apply to the Judicial Branch of government. . . We have observed, however, that limitations on ex post facto judicial decisionmaking are inherent in the notion of due process." The Honorable Donald C. Nugent of this Court has likewise held that a petitioner cannot state a claim under the Ex Post Facto

*Clause* for the Ohio Supreme Court's retroactive application of a judicially modified statute because the Ohio court is not a legislature. *See Ross v. Kelley*, No. 5:08CV2889, (N.D. Ohio Oct. 5, 2009) (ECF Dkt. #10, Limbert, M.J. R&R at 42-44 "that if a law is improperly made retroactive by a court, a Petitioner's remedy, if he has one, lies in the Due Process Clause, not the Ex Post Facto Clause. . . *Rogers* makes clear that the pertinent question for determining whether a petitioner has a valid Ex Post Facto Clause claim is which branch of government committed the alleged constitutional violation. Here, Petitioner alleges that the judicial branch violated his constitutional rights; therefore his claim under the Ex Post Facto Clause lacks merit. . .The fact that the *Foster* court may have acted akin to the legislature does not make the Supreme Court of Ohio a legislature. It remains true that 'As the text of the [Ex Post Facto] Clause makes clear, it is a limitation upon the powers of the Legislature, and does not of its own force apply to the Judicial Branch of government.' " *Rogers*, 532 U.S. at 456.") (ECF Dkt. #12 Nugent, J., Adopting R&R.), unreported; *Kravochuck v. Shewalter*, No. 1:09CV199, (N.D. Ohio Oct. 5, 2009), unreported; *McGhee v. Konteh*, No. 1:07CV1408, 2008 WL 320763 (N.D.Ohio Jan. 25 2008), unreported.. The Honorable Solomon Oliver, Jr. has held the same: "the trial court's use of the sentencing statute re-shaped by *Foster* in sentencing Woody did not violate due process or the Ex Post Facto Clause of the Constitution." *Woody v. Welch*, No. 3:08CV2534, 2009 WL 1440828 at *10 (N.D. Ohio, May 20, 2009), unreported. Petitioner's argument relies upon *Miller v. Florida*, 482, U.S. 423, (1987) to establish that the Ohio courts' retroactive application of *Foster* was an unforeseeable judicial enlargement of Ohio sentencing statutes. ECF Dkt. #9 at 4-7. Judge Nugent thoroughly addressed this argument in *Kravochuck* and determined that the U.S. Supreme Court's decisions in *Cunningham v. California*, 549 U.S. 270, 127 S.Ct. 856, 166 L.Ed.2d 856 (2007), was more applicable because:

> [*Cunningham*] is a more recent case and deals specifically with resentencing following a Blakely violation and modification of Sixth Amendment violative sentencing statutes. On the other hand, Miller dealt with retroactive legislation and a violation of the Ex Post Facto Clause. Further, the *Cunningham* case demonstrates that a court can retroactively permit judges to exercise broad judicial discretion and sentence [within] a full statutory range.

*Kravochuck*, 2009 WL 3208663 at *9. Judge Nugent's holding in *Kravochuck* is consistent with his

-14-

holding in *Ross* and with Judge Boyko's holding in *Orwick*. Although neither *Ross* nor *Orwick* required analysis of *Miller*, those cases demonstrate that no Ex Post Facto Clause or Due Process Clause violation occurs upon resentencing under the post-*Foster* sentencing scheme.

To the extent Petitioner claims that the Ohio courts violated his Due Process rights by retroactively applying the post-*Foster* sentencing statute to his case to impose more than minimum sentences, the undersigned recommends that the Court find that his claim lacks merit. Judge Boyko, Judge Nugent, and Judge Oliver of this Court have rejected similar claims in other cases, holding that no constitutional violation arose with the retroactive application of the post-*Foster* sentencing statute on remand to a petitioner who was improperly sentenced under the pre-*Foster* statute. *See Ross*, No. 5:08CV2889 at *29-*31 (noting that the *Cunningham* Court permitted the state court to exercise sentencing discretion on remand in Defendant Cunningham's case under the authority of *Booker*; therefore, the retroactive application of *Foster* to Defendant Ross was also consistent with *Booker*); *Kravochuck*, No. 1:09CV199 at *10; *Woody*, 2009 WL 1440828 at *10 ("A number of federal defendants have alleged that the federal sentencing statutes reshaped by *Booker* violate due process because they subject defendants to ex post facto laws. Those challenges have been universally rejected. . . Woody makes no argument that distinguishes in any relevant respect Ohio's revised sentencing statutes from the revised federal sentencing statutes upheld by the appellate courts.") (internal citations omitted).

Petitioner also claims that the Ohio courts violated his Due Process rights by imposing consecutive sentences based upon judicial fact finding. ECF Dkt. #1, Attach. C. Recently, the United States Supreme Court decided *Oregon v. Ice*, 129 S.Ct. 711 ( 2009), and held that "In light of this history, legislative reforms regarding the imposition of multiple sentences do not implicate the core concerns that prompted our decision in *Apprendi*." *Ice*, 129 at 717. Applying this precedent Judge Nugent has held that imposing consecutive sentences for discrete crimes does not violate the Due Process Clause of the federal constitution. *Ross*, No. 5:08CV2889 (ECF Dkt. #10, R&R at 39-42, *adopted*, ECF Dkt. #12); *Kravochuck*, No. 1:09CV199 (ECF Dkt. #9, R&R at 17-19, *adopted*, ECF Dkt. #11). Here, Petitioner committed discrete acts at discrete times, which pursuant to *Ice*, are

punishable by consecutive sentences. Accordingly, the undersigned recommends that the Court dismiss Ground One insofar as it claims Petitioner's constitutional rights were violated by the imposition of consecutive sentences.

### C. Petitioner's Letter

Lastly, the undersigned notes that Petitioner has sent a letter to the Court that is best classified as a parole argument. ECF Dkt. #9. The letter states that: Petitioner feels five years of incarceration has been "good" for him; he has been in an outpatient program for drug treatment; he has a daughter that needs him; the sentences he received were very high for the crimes that he committed; and he is "not in the best of health" and deserves another chance in life. *Id*.

These claims are not cognizable in a habeas petition. *See U.S. ex rel. McCloud v. Rundle*, 272 F.Supp. 977, 982 (D.C.Pa. 1967) ("Although this Court is sympathetic to relator in that he appears to have mended his ways in many respects, it is not our province to grant him relief in the nature of parole."). Furthermore, these arguments were not incorporated in the initial petition and would most likely be time-barred. Therefore, the undersigned recommends that the Court dismiss these claims with prejudice.

## VI. CONCLUSION

For the foregoing reasons, the undersigned RECOMMENDS that the Court DISMISS the instant petition in its entirety with prejudice.


DATE: February 2, 2010                  *s/ George J. Limbert*
                                        GEORGE J. LIMBERT
                                        UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time may constitute a WAIVER of the right to appeal the Magistrate Judge's recommendation. L.R. 72.3(b).